**YOUNGSTOWN SHEET & TUBE CO. et al. v. UNITED STATES et al.**

**VALLEY CAMP COAL CO. et al. v. SAME.**

Nos. 4885, 4890.

District Court, N. D. Ohio, E. D.

May 12, 1934.

J. C. Argetsinger and J. E. Bennett, both of Youngstown, Ohio, and August G. Gutheim, of Washington, D. C., for plaintiffs Youngstown Sheet & Tube Co. and others.

George A. Blackford, of Wheeling, W. Va., and Charles S. Reed, of Cleveland, Ohio, for plaintiffs Valley Camp Coal Co. and others.

Nelson Thomas and Daniel W. Knowlton, both of Washington, D. C., for the Interstate Commerce Commission.

E. B. Freed, U. S. Atty., of Cleveland, Ohio, and Elmer B. Collins and Harold M. Stephens, both of Washington, D. C., for the United States.

Baker, Hostetler, Sidlo & Patterson, of Cleveland, Ohio, and Charles R. Webber and John J. Fitzpatrick, both of Baltimore, Md., for interveners Baltimore & Ohio R. Co. and others.

Henry C. Hall and Alex. M. Bull, both of Washington, D. C., for interveners Robt. C. Hill and Howell Fisher, receivers of Consolidation Coal Co. of West Virginia and of Maryland and others.

Smith, Best & Horn, of Greensburg, Pa., for interveners Westmoreland Coal Co. of Pennsylvania and others.

Leo P. Day, of Chicago, Ill., for New York Central Lines.

M. Carter Hall, of Richmond, Va., for Chesapeake & O. Ry. Co.

Guernsey Orcutt, of Pittsburgh, Pa., for Pennsylvania R. Co.

Before HICKS and SIMONS, Circuit Judges, and HOUGH, District Judge.

SIMONS, Circuit Judge.

It is sought in these cases to set aside an order of the Interstate Commerce Commission entered December 5, 1933, in Investigation and Suspension Docket No. 3282, Coal Bituminous Ex-River from Colona and Conway, Pa., to Youngstown, Ohio, which proceeding included Investigation and Suspension Docket No. 3619, Ex-Ohio River Coal to Cleveland, Lorraine and Other Ohio Points. The order required certain carriers to increase to prescribed minima freight rates between points on the Ohio river, and destinations in Northern Ohio, upon coal originating at mines on the Monongahela, Allegheny, and Ohio rivers, and brought by water to the rail carrier. The plaintiffs in case No. 4885 are, or represent, consumers of coal in the so-called Youngstown district, who will have to pay the prescribed increase. The plaintiffs in case 4890 include shippers of coal, who will also be affected by the Commission's order,

and a barge company now engaged in river carriage. A brief historical review of the controversy seems necessary to an understanding of the issues involved.

Youngstown, an important iron and steel manufacturing district, is a very large consumer of bituminous coal originating in Western Pennsylvania at both river and inland mines. The coking of coal was formerly done at the mine, and the coke transported to the blast furnaces. With the development of the bi-product coke oven, coking came to be done at the furnace, and transportation from the mine became one of coal rather than of coke. Coke, not lending itself to water transportation because of the undesirable breaking down of structure in handling, facilities for its transportation by water were not sought. Bituminous coal however, is especially suitable for water transportation, because the breaking down of its structure is an advantage rather than otherwise.

About the time this change came in the manner of coking, the government began to develop the upper Ohio river, and by 1928 there was available a nine-foot channel from the Western Pennsylvania coal fields to Cairo, Ill. The competitors of the Youngstown district in the steel industry are mostly located in Pittsburg, Allegheny, Wheeling, and Steubenville. In the Pittsburg-Wheeling district the plants are at the river bank, where coal deliveries may be made by water. The contemporaneous development of the bi-product coke oven and the river channel placed the furnaces in the Pittsburg-Wheeling district in a highly advantageous position, independent of rail carriers and high freight rates for their coal supply. The Youngstown district, being forty miles north of the river, was not in such position. It was felt that if Youngstown could have its coal brought by water to points on the Ohio river forty miles away, with adequate rail facilities for its transportation from the river, at reasonable rates, Youngstown could enjoy the benefit of one hundred miles of water transportation, and acquire a more advantageously competitive position with the furnaces in Pittsburg, Steubenville, and Wheeling. Ten years of negotiation, however, with the rail carriers for a river and rail route proved of no avail.

In 1928, the Lisbon Railroad proposed to build a line from Smith's Ferry on the Ohio river to Youngstown, and applied to the Interstate Commerce Commission for a certificate of public convenience and necessity, its application being supported by the Youngstown district. Smith's Ferry is on the Ohio river, west and below Conway and Colona, but approximately the same distance from Youngs-

town. The Pennsylvania, the Baltimore & Ohio, and the Pittsburg & Lake Erie Railroads intervened and opposed the application. The Commission found that while public convenience and necessity of Youngstown entitled it to the proposed service, the additional forty miles of railroad would result in duplication of facilities, and called upon the trunk line roads from Conway and Colona to Youngstown to show what service they could provide. The result was the denial of the Lisbon application. Construction of Branches by Pittsburgh, L. & W. R. Co., 150 I. C. C. 43. The Pennsylvania and the Pittsburg & Lake Erie had filed tariffs prescribing a rate of $1.02 per ton upon ex-river coal from Conway and Colona to Youngstown. The Commission of its own motion suspended this rate, and found the maximum reasonable rate between such points to be 77 cents. Coal, Bituminous, Ex River, from Colona and Conway, Pa., to Youngstown, Ohio, 163 I. C. C. 3. This rate, however, was not put into effect until July 16, 1932.

Upon the establishment by the trunk line roads of the 77-cent rate, the coal began moving on the river from the mines in Western Pennsylvania via Conway and Colona to Youngstown. The carriers thereafter filed two petitions to reopen the cases cited, on the ground that the 77-cent rate from Colona and Conway was so low as to disrupt the adjustment of all-rail coal rates, was unreasonable, and unduly preferential. The Commission denied the first petition, but granted the second, and on May 8, 1932, reopened both cases and assigned them for hearing. At the further hearing the two cases were consolidated, the case orally argued before the full Commission, and on December 5, 1933, the order now attacked was made.

The Commission modified the findings of its former report, found the ex-river rates assailed to be unreasonably low, and determined the reasonable minimum from Colona and Conway to Youngstown to be 90 cents on ex-river coal originating at mines on the Monongahela, Allegheny, and Ohio rivers, transferred from river barges or boats to railroad cars, when for track delivery at the destination named. It found that the maintenance of the existing ex-river rate on any lower basis constituted undue prejudice against operators of inland mines located in the Freeport, Pittsburg, Connollsville, and Fairmont districts, and undue preference to operators of mines on the Monongahela, Allegheny, and Ohio rivers.

Before proceeding to the question of the validity of the Commission's order, it is necessary to give consideration to the jurisdictional question raised by the motions of the defendants in each case to dismiss the bill therein. The basis for the motions is that shippers under the circumstances presented have no such proprietary rights or legal interests as enable them to maintain suits to enjoin the order. Reliance is placed upon Moffat Tunnel League et al. v. United States, 289 U. S. 113, 53 S. Ct. 543, 77 L. Ed. 1069; Edward Hines Yellow Pine Trustees v. United States, 263 U. S. 143, 44 S. Ct. 72, 68 L. Ed. 216; and Alexander Sprunt & Son, Inc., v. United States, 281 U. S. 249, 50 S. Ct. 315, 74 L. Ed. 832. With the exception of the Costanzo Transportation Company in the second suit, the plaintiffs are all either shippers or prospective shippers, consignees in the first suit and consignors in the second. Principal reliance is placed upon the Sprunt Case, thoroughly analyzed and argued in each of the briefs. In that case the Sprunts had an economic advantage over competitors destroyed by a reduction of rate applicable to such competitors on delivery of cotton to shipside. It was held that while the enjoyment of this advantage gave the Sprunts a distinct interest in the proceeding before the Commission under section 3 of the Interstate Commerce Act (49 USCA § 3), and having this interest they were entitled to intervene in the administrative proceeding initiated by the carriers, that the carriers having acquiesced in the orders of the Commission, the Sprunts had no longer an independent right by suit to assail the Commission's order. As shippers they were entitled only to reasonable service at reasonable rates without unjust discrimination, and if such service and rates were accorded, they could not complain of the retraction of a competitive advantage to which they were not otherwise entitled. The situation of the shippers and consignees in these cases is not that of the Sprunts. If the order of the Commission is sustained, they will be obliged to pay an additional freight charge of 13 cents a ton on all coal they buy or sell that is shipped ex-river. They claim the proposed minimum rate to be unreasonable, and any doubt that may have existed as to the allegations of the bill being sufficient to raise the question of reasonableness is now resolved by the amendments made to the pleadings at the hearing. The common-law rights of the plaintiffs to reasonable maximum rates are claimed to be preserved by section 22 (1) of the Interstate Commerce Act (49 USCA § 22 (1), which provides: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." It would seem that the situation here

with respect to the shippers and consignees is clearly distinguishable both on facts and principle from the situation of the plaintiffs in the Sprunt Case, and that the other cases may likewise be distinguished, as in fact they were by Judge Parker in his careful opinion in Anchor Coal Company v. United States, 25 F.(2d) 462 (D. C. W. Va.), decided, however, before the opinion in the Sprunt Case was announced. Noting this important, and perhaps controlling, distinction in the situation of these plaintiffs, we are content to assume without deciding, since in view of our subsequent conclusions decision is not imperative, that the plaintiffs have a justiciable grievance which can be here litigated.

As to the right of the Costanzo Transportation Company to join as party plaintiff, we are clear that it is without such right. It operates a barge line on the Ohio river, and its only interest in the case arises from the fact that a readjustment of ex-river rates may affect its share in the river traffic. It is not otherwise affected by the Commission's order. The Sprunt and other holdings are controlling on the issue raised with respect to it by the motion to dismiss. See, also, United States v. Illinois Central Railroad, 54 S. Ct. 471, 78 L. Ed. 909, announced March 5, 1934. The motion to dismiss must therefore be sustained with respect to the Costanzo Transportation Company.

We note also the second ground for the motions to dismiss, namely, that decision here would be futile, and of a question that is moot in view of the right of the carriers to publish a new rate schedule; the old one having been suspended. In view of our previous assumption, and of our conclusions upon the merits of the bills, it is perhaps sufficient to observe that the second ground for the motions may have been urged on the assumption that the bills do not attack the reasonableness of the 90-cent rate, and that the presence of the carriers by intervention in this proceeding may not have been fully considered.

The first attack upon the order of the Commission here assailed is that it is not supported by substantial evidence, and in its pursuance a very detailed analysis is made of the evidence intended to be wholly destructive. Were we to consider all of the findings mutually related and interdependent, so that if one failed because of lack of substantial evidence the order must fail, this might be successful. We are not, however, required to apply so rigid a test to the record. It seems to us that we need go no further than to say, as did the Supreme Court in Chicago, Rock Island & Pacific Railway v. United States, 274 U. S. 29, 47 S. Ct. 486, 488, 71 L. Ed. 911, in reliance upon Virginian Railway Company v. United States, 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463: "The order here does not rest alone upon comparisons with the all-rail rates, as seems to be contended, but is supported by other established facts and circumstances as well. See Western Chemical Co. v. United States, 271 U. S. 268, 271, 46 S. Ct. 500, 70 L. Ed. 941. Nothing is to be gained by a review of the evidence."

It may be unnecessary to repeat what was said by the statutory court in the Ohio cases, State of Ohio v. United States (D. C.) 6 F. Supp. 386, 387: "In a case of this sort we are, of course, concerned only with the sufficiency of the evidence to support the fact finding of the Commission and the sufficiency of the facts found to support the conclusion of the order entered. While the Commission must act upon evidence and not arbitrarily, and must properly apply the law, the courts are not concerned with 'the soundness of the reasoning by which its conclusions are reached, or whether the findings are consistent with those made by it in other cases.' Nor are we concerned with the 'wisdom' of the regulation which is prescribed. These are matters left by Congress exclusively to the administrative branch of the government." The cases declaring the rule are sufficiently cited in the opinion. The alleged inconsistencies of the Commission need give us no concern. It is well settled that the orders of the Commission, and its past fact findings, are not res adjudicata. We are concerned only with its present findings and conclusions upon the current evidence.

The contention that the findings do not support the conclusions of the Commission, that the present rate from Conway and Colona to Youngstown is unduly preferential and prejudicial, seems to resolve itself into another attack upon the evidence as not sustaining the findings, for the findings are clearly to the effect that the ex-river rates assailed are unreasonably low, and that their maintenance constitutes undue prejudice against the operators of inland mines, and undue preference of operators of the river mines. If either or both of these findings of ultimate facts are sustained by the evidence, as we think they are, the findings support the order.

It is further contended that the Commission proceeded under an erroneous construction of the law, and misapprehension with respect to its powers thereunder. The argument under this head, as we understand it, is twofold: First, that if prejudice against inland mines or preference of river mines ex-

isted, it was due to their geographical position rather than to disparity of rates, and that when the Commission endeavored to equalize geographical or economic advantage, it exceeded its lawful powers because the Congress neither gave nor could it give to it the power to "equalize fortune, opportunities, or abilities." Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 24, 56 L. Ed. 83. Second, that the Commission did not give full consideration to the language of section 500 of the Transportation Act of 1920 (49 USCA § 142), which is as follows: "It is declared to be the policy of Congress to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation."

Both lines of argument proceed, however, upon the assumption that the Commission both aimed at and achieved a parity between the all-rail rate and the combined water and rail rate from Ohio river points to Youngstown and other destinations. This assumption is, however, warranted neither by the evidence nor by the findings of the Commission. The base or key rate on all-rail transportation from the Pittsburg district to Youngstown is $1.34 per ton. The order provided for a differential based on transportation to Youngstown of 44 cents per ton between the ex-river rate and the key rate. There was much testimony as to the cost of river transportation from the mines to Colona and Conway, and the transfer charges for conveying coal from barges to the rails. It need not be analyzed. It is sufficient to say that there was substantial evidence to the effect that based upon the 90-cent ex-river rate there is still left a substantial disparity of rate between the all-rail haul and the combined river and rail movement in favor of the latter. We cannot weigh this evidence, and have no power to challenge the conclusiveness of the Commission's determination in this respect. The difference in rate is also emphasized by the argument advanced by the plaintiffs in case 4885 in brief to the Commission, that the higher ex-river rate sought by the carriers would be substantially the same as the all-rail rate.

The finding that undue prejudice and preference resulted from the original ex-river rate is amply sustained by the evidence. Seventy per cent. of the coal whose transportation is here involved, originates at inland mines, and but 30 per cent. at the mines having access to the river. The Commission quite properly gave consideration to evidence tending to show that this large competitive source of bituminous coal was or would be eliminated from competition by the suspended ex-river rate. It is unimportant that of the great number of inland mines affected, but five were represented by witnesses at the hearing. In considering whether the record supports the findings, we give no consideration to the number of witnesses, nor assume to control the Commission in the weight to be given to the testimony of any.

Returning to the contention that the Commission's order equalizes geographical advantages, some consideration must be given to the history of the controversy already detailed. It will be noted that prior to the development of the river channel and the bi-product coke oven, there was neither any movement of coal by water to Youngstown nor demand for such movement. It is also to be noted that even after the adoption of the present method of coking, and the deepening of the channel, there was still no water transportation of coal to Youngstown, or if there was it was negligible. It was only after the 77-cent ex-river rate became effective that the coal began to move. If after the establishment of the maximum ex-river rate undue prejudice resulted to the inland coal mines, we are unable to say upon this record that no part of such prejudice was due to the rate. That is for the determination of the Commission upon the evidence. The circumstances here permit the application of no such simple formula as was applied in the Anchor Coal Company Case, supra, where the Commission attempted to increase a differential already existing in favor of the district having the shorter haul, and against the district having the longer haul. The facts there permitted but one reasonable inference, i. e., that if a substantial difference in rate already existing could not prevent diversion of tonnage from one district to another, the diversion must necessarily have been due to other considerations, economic and industrial, which enabled the district with the higher rate to compete to its advantage with the district enjoying the lower rate. The facts here compel no such inference of causal relation.

Coming finally to the language of section 500 of the Transportation Act, it is to be noted that it declares the policy of the Congress to be "to promote, encourage, and develop water transportation, service, and facilities." It is also to be observed that it is equally the policy of the Congress, "to foster and preserve in full vigor both rail and water transportation." Whether section 500 is a mandate to the Commission, or merely a declaration of policy, is unimportant. It has been held that if rates fixed or permitted by

orders of the Commission would be reasonable in the absence of barge competition, they are no less reasonable because of such competition. Mississippi Valley Barge Line Company v. United States (D. C.) 4 F. Supp. 745. A somewhat similar declaration with respect to the giving of consideration to an existing depression in agriculture made by the Congress in the so-called Hoch-Smith Resolution of January 30, 1925 (49 USCA § 55), made no change in the existing law, and did not make unlawful any rate which under the existing law was a lawful rate, but left the validity of the rate to be tested by that law. Ann Arbor Railroad v. United States, 281 U. S. 658, 50 S. Ct. 444, 74 L. Ed. 1098. See, also, Chicago, Rock Island & Pacific Railway Co. v. United States, supra.

▇▇▇ Whatever view may be taken of section 500, it is clear, that a rate which is unreasonable because it fails to give the carrier an adequate return, because it unreasonably threatens the rate structure, or because it creates undue or unreasonable prejudice or preference as between individuals or localities, is still unreasonable and must be suspended even though its raising or lowering may adversely affect competitive water transportation, but that within the zone of reasonableness consideration must be given to the right of shippers to avail themselves of the advantages of water transportation insofar as it is possible to do so without bringing about those evils in railroad transportation which rate legislation was designed to correct. Applying this view we think the Commission in its order gave full and adequate consideration to the mandate or admonition of section 500 of the Transportation Act. This is demonstrated by the opinion of the Commission that the ex-river rate of $1.02 sought by the trunk line roads was by comparison with all-rail rates, and in the light of other evidence, a reasonable rate. Notwithstanding it fixed the minimum rate at 90 cents. To put the problem another way, we think the Commission, confronted by two duties, not necessarily irreconcilable, one to promote water and the other to preserve rail transportation, has performed both, when, within the zone of reasonableness, it has struck a just and proper balance between them. In determining this balance between the encouragement of the one and the preservation of the other form of transportation, the discretionary response to congressional mandate or admonition is, of course, that of the Commission, and not that of the court, and if recognition is given to each consideration that advantages the one or other, we cannot say that such discretion is abused, or that determination was arbitrary or capricious.

It follows from what we have said that the petition for interlocutory injunction in each case must be denied. Orders may be entered granting any petition to intervene that may not have already been acted upon. It having been stipulated that the hearing had was final as well as preliminary, a decree will be entered in each case dismissing the bill. Findings of fact, as required by the rule, will be filed contemporaneously herewith.